# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

RICHARD W. SHIRLEY,

     **Petitioner,**

     **v.**                                **Case No. 14-CV-1346**

MICHAEL DITTMANN,

     **Respondent.**

---

## DECISION AND ORDER DENYING PETITION
## FOR WRIT OF HABEAS CORPUS AND DISMISSING CASE

---

Richard W. Shirley, a prisoner in Wisconsin custody, was sentenced to 35 years of confinement followed by 10 years of extended supervision after a jury convicted him of one count of first degree reckless homicide, in violation of Wis. Stat. § 940.02(1). (Docket # 1 at 2.) He filed this petition for writ of habeas corpus under 28 U.S.C. § 2254 claiming that his conviction and sentence are unconstitutional. For the reasons stated below, the petition for writ of habeas corpus will be denied and the case dismissed.

## BACKGROUND

On March 18, 2008, Shirley was charged with one count of first-degree intentional homicide. (Ct. App. Decision in 2012AP263-CR, Docket # 1-1 at 2.) The allegations concerned the fatal shooting of Frederick Perry at a gas station on Teutonia Avenue in Milwaukee. (*Id.*) Shirley went to trial, and the jury convicted him of the lesser-included offense of first-degree reckless homicide. (*Id.* at 4.)

*Officer David Martinez*

Officer David Martinez was the first witness to testify. (Tr. of Jury Trial, June 17, 2008 p.m., Docket # 13-13 at 35.) Martinez worked as a police officer in District 7, and was working the day of the shooting—February 16, 2008. (*Id.* at 36.) He testified that he heard the call about the shooting around 12:49 p.m. and that he and his partner responded to the Citgo gas station on Teutonia Avenue. (*Id.* at 36-37.) When they arrived, Martinez saw a person lying on the ground on his back. (*Id.* at 37.) Upon approaching the person, he saw that the person had blood coming from his mouth and from the back of his head. (*Id.*) The person was unresponsive, and Martinez testified he immediately started CPR as he could not find a pulse. (*Id.*) When the Milwaukee Fire Department arrived and took over, he went inside the gas station to see if there was video surveillance and to see if there were any witnesses. (*Id.* at 38.)

Martinez testified that when he came back outside, a woman came across the police line toward the crime scene. (*Id.* at 41.) She was visibly upset and crying, and the officers had to place hands on her to stop her from proceeding into the scene. (*Id.*) The woman told the officers that she heard that her boyfriend, whom she identified as Richard Shirley, had been shot. (*Id.* at 42.) Martinez contacted his operator to see if he could get more information about Shirley and he learned that Shirley walked with a substantial limp due to missing a portion of one of his legs. (*Id.* at 43.) Martinez testified that neither he nor anyone else (to his knowledge) came across a person matching Shirley's description at the scene. (*Id.* at 45.)

*Jacquell Hawthorne*

Jacquell Hawthorne testified that Frederick Perry (the victim) was his first cousin. (*Id.* at 48.) On February 16, 2008, Hawthorne rode to the Citgo gas station on Teutonia in his uncle Udalius

McCloud's car (a blue Cadillac) around 11:30 a.m. or 12:00 p.m. to get cigars and batteries. (*Id.* at 48-49.) Perry was also in the car, seated in the front passenger seat. (*Id.* at 49.) McCould pulled up to a pump; the pump was on the passenger side and the car was facing the gas station. (*Id.* at 49-50.) Another car, a burgundy Oldsmobile, pulled up on the other side of the pump. (*Id.* at 51-52.) The passenger went into the gas station. (*Id.* at 52-53.) McCloud also went into the gas station. (*Id.* at 54.) When McCould came back out of the gas station, he commented that he saw a big gun on the seat in the Oldsmobile. (*Id.* at 55.) Hawthorne testified that Perry then made a comment to the driver, whom he later identified as Shirley (*id.* at 57), about the music coming from the Oldsmobile (*id.* at 55-56). Shirley told Perry that he would show him the sound system, which was in the trunk. (*Id.* at 56.)

Hawthorne testified that McCloud and Perry met Shirley at the back of the Oldsmobile. (*Id.*) It was his impression that the three of them were having a friendly conversation. (*Id.* at 59.) Hawthorne testified that Perry had a gun in the waistband of his pants; he was able to tell because Perry "clutched it when he was in the back [of] the car when they was lookin' at the speakers." (*Id.* at 114.) After a few minutes, McCloud and Perry returned to the car. (*Id.* at 59.) Perry got back into the car, and Hawthorne testified that McCloud was about to get back into the car when Shirley came over to the passenger side of their car. (*Id.*) Specifically, Shirley went from the back of his car to the front of the car on the driver's side. (*Id.* at 115.) Hawthorne testified that Shirley walked with a limp. (*Id.* at 60, 122.) When Shirley got to Perry's door, Shirley pulled a gun from the waistband on his pants. (*Id.* at 61, 115.) Hawthorne testified that he remembered telling a detective shortly after the incident that Shirley asked if they knew anyone who wanted to buy the gun and that he had another .357 in the back of the car. (*Id.* at 62-63.) At that point, Perry and Shirley began to struggle over the

gun. (*Id.* at 64.) Hawthorne testified that as Perry and Shirley struggled, the gun went off. (*Id.* at 65.) Hawthorne remained in the car, and eventually, Perry was out of the passenger seat and outside the car with Shirley. (*Id.* at 65-66.) Then, a bullet came through the back passenger side window. (*Id.* at 66.) Hawthorne testified that at that point, he and McCloud got out of the car and went around to the back of the Cadillac and ducked. (*Id.* at 67.) He continued to hear shots, though he was not sure how many. (*Id.*) He was not looking at Shirley and Perry and could not see what was happening. (*Id.* at 67-68.)

Hawthorne testified that when Shirley stood up, Perry was on the ground. (*Id.* at 68.) At that point, he ran toward the street. (*Id.*) Shirley ran over to his car. (*Id.* at 69.) Hawthorne testified that he went back to the gas station lot. (*Id.* at 70.) Perry was lying on the ground, and Hawthorne testified that there was blood in his hair and "a shot laying right by his armpit." (*Id.* at 70-71.) Perry's head was faced toward the Cadillac. (*Id.* at 93, 94-95.)

*Udalius McCloud*

Udalius McCloud also testified. Frederick Perry was his nephew, and he was with him during the late morning, early afternoon on February 16, 2008. (Tr. of Jury Trial, June 19, 2008 a.m., Docket # 13-14 at 5.) They were at a Citgo gas station on the corner of Teutonia and Hampton in Milwaukee; they drove there in McCloud's Cadillac. (*Id.*) McCloud testified that Perry was in the front passenger seat, and his nephew "Quell" (Jacquell Hawthorne) was in the back on the passenger side. (*Id.* at 6-7.) He pulled up to a pump at the Citgo, and the car was facing the gas station. (*Id.* at 7-8.) He went to the gas station to buy batteries for his iPod; there were no plans to buy a gun. (*Id.* at 62.) McCloud went into the gas station, and when he came back out a brown car was pulling up. (*Id.* at 8-9.) The car had two occupants and was playing loud music. (*Id.* at 9.) The passenger went

into the gas station, and McCloud testified he could not really describe him. (*Id.* at 10.) The driver, McCloud noted, walked with a limp. (*Id.* at 11.) McCloud testified that he also noticed that the driver had a gun. (*Id.*)

Once McCloud noticed that the driver had a gun, he went to get into his own car. (*Id.* at 12.) McCloud testified that the driver liked the Cadillac he was driving and that he had never seen this person before. (*Id.* at 36.) Perry started asking about the music and complimenting the sound system. (*Id.* at 12-14.) The driver asked Perry if he wanted to see the sound system, which was in the trunk. (*Id.* at 15.) McCloud testified that he told Perry that the driver had a gun, but Perry got out of the car anyway. (*Id.*) Perry went to the trunk of the other vehicle, and McCloud testified that he got out of his car to look at the sound system, "[g]lanced at it a little bit and got right back in the car, yeah." (*Id.* at 16.) McCloud testified there was no argument or struggle between Perry and the driver while they were looking at the sound system in the trunk. (*Id.* at 17.) This was just a friendly exchange. (*Id.* at 37.) After Perry and the driver talked about the sound system, Perry returned to the car. (*Id.* at 16-17.) According to McCloud, Perry asked the driver of the vehicle about the gun. (*Id.* at 19.) The driver then came over to the car. (*Id.*) Perry sat in the front passenger seat, where he had been seated before, when the driver of the other car came to McCloud's car. (*Id.* at 18.) The driver stood right in the open door, holding the gun in his hand. (*Id.* at 20.) The barrel was facing down. (*Id.*) The driver handed Perry the gun, and McCloud testified the driver was smiling; there was no argument going on. (*Id.* at 20-21.) McCloud testified that he told Perry to get the gun out of the car. (*Id.* at 22.) He further testified that Perry pulled back the slide and saw that there was a bullet in the chamber, and Perry asked the driver why he would hand him a gun with "one in the hole." (*Id.* at 22-23.) The driver kept smiling and responded to not worry about it, that he still had one more. (*Id.* at 22-24.)

McCloud testified that after the driver responded, "he jumped in the car." (*Id.* at 24.) The first time the gun went off, Perry was still in the front passenger seat. (*Id.* at 25-26.) Then, Perry and the driver started "tussling." (*Id.*) McCloud testified that he left the vehicle when he heard the first shot. (*Id.* at 26.) Hawthorne also got out of the car, and the two of them ran down Hampton towards AutoZone.[1] (*Id.*) As they ran, McCloud looked back before getting to the auto parts store and saw the driver (Shirley) getting up off the ground. (*Id.* at 38.) They came back to the gas station, and the other car was no longer there. (*Id.* at 31-32.) McCloud testified that they found Perry and that he called for an ambulance. (*Id.* at 32.) Perry was lying on his back, and he and Hawthorne did not try to move him. (*Id.* at 58, 60.) The police arrived, and McCloud stayed there and spoke to the police. (*Id.* at 32-33.) Eventually, he went down to the station and participated in a lineup. (*Id.* at 34.) McCloud testified that he was not able to identify anyone as the driver of the other vehicle. (*Id.*) Finally, McCloud testified that neither he nor Hawthorne had a gun, and Perry only had a gun when the driver of the other vehicle handed it to him. (*Id.* at 35.)

McCloud spoke with a detective, at which time he told the detective that he thought Perry might try to keep the gun that the driver had handed to him. (*Id.* at 46, 49.) Later, he testified that Perry told him that if the driver gave him the gun, the driver wasn't likely to get it back. (*Id.* at 61-62, 67-68.) McCloud testified that he agreed that he told the detective that he repeatedly told Perry to give back the gun. (*Id.* at 50.) According to McCloud, Perry asked the driver why he would hand him a gun with a bullet in the chamber. (*Id.*) When Perry pointed the gun toward the driver and made that statement, the driver reached in and tried to grab the gun back. (*Id.*) A struggle ensued, and then

---

[1] Later, the prosecutor and McCloud refer to it as "Advanced Auto." (Docket # 13-14 at 29.)

shots were being fired. (*Id.* at 51.) McCloud testified that once the gun started going off, he and Hawthorne got out of the car and away from the gunfire. (*Id.*) He testified that everything "happened so fast." (*Id.*)

*Angela Ortenblad*

Angela Ortenblad testified that around 12:30 or 12:35 p.m. on February 16, 2008, she was driving her car down Hampton (eastbound, towards Teutonia Avenue), heading to work for a 1:00 p.m. shift. (*Id.* at 75-76.) She stopped at the intersection of Hampton and Teutonia, about seven or eight car lengths away from where Teutonia intersected Hampton. (*Id.* at 76.) She heard a noise to her left, drawing her attention towards the gas station. (*Id.* at 76-77, 83.) Ortenblad testified that at first she thought it might have been a car backfiring. (*Id.* at 77.) When she looked towards the gas station, she saw one man standing up and another man lying on the ground near a car by one of the pumps. (*Id.*) A red-colored car was parked there, and on the other side of the pump there was a blue car. (*Id.* at 78-80.) The man who was standing was by the passenger side front tire of the red car. (*Id.* at 80.) He was angled away from her, and she could only see the left side of his body; she could not really see his face. (*Id.* at 81.) The man on the ground was in front of the man who was standing; she could only see his head and chest as the rest of his body was behind the car. (*Id.* at 82.) The person on the ground's body was oriented east-west, with his head facing west. (*Id.* at 94-95.) His legs and feet were behind the car from her view from the road. (*Id.* at 95.) Ortenblad testified that she then heard a series of the same noise she heard earlier and figured out it was gunshots. (*Id.* at 82.) There were a couple of shots in rapid succession, a "very, very slight pause," and then one or two more shots. (*Id.* at 84.) She called 911 after she heard the last shot. (*Id.* at 82, 106.) Ortenblad testified she

thought the whole thing took four to five seconds and that it was definitely less than ten seconds. (*Id.* at 94.)

After the second round of shots, the man turned around. (*Id.* at 84.) Ortenblad testified she was able to see him with a gun in his right hand, which was at chest level. (*Id.*) She described the man as African-American and noted that he was hopping on one leg. (*Id.* at 86, 92.) Ortenblad could not state for sure which leg he was hopping on. (*Id.* at 92.) He hopped from where he was by the passenger side, around the front of the car, and opened his car door and got in. (*Id.* at 86.) Ortenblad testified that she did not know if that car ever left the lot because the light turned green and she "drove out of there as fast as [she] could." (*Id.* at 87.) She was still on the phone with the 911 operator. (*Id.*) Ortenblad was asked to go to the police station and participate in a photo lineup. (*Id.* at 90.) She could not identify the person she saw with the gun. (*Id.* at 91.)

During her interview with police, Ortenblad and the officers reenacted the incident as best they could and determined that it lasted approximately four to five seconds from start to finish. (*Id.* at 93.) During the interview, she told the detective that she heard four to five shots. (*Id.*)

At the trial, Ortenblad used a diagram to demonstrate where her car was in relation to the gas station. (*Id.* at 96-98.) There were approximately seven or eight cars in front of her when she stopped at the stoplight. (*Id.* at 98.) Ortenblad also participated in a physical demonstration with Shirley's attorney to show how far apart the victim and the defendant were. (*Id.* at 102-103.) She identified where she saw the victim's head (*id.*) and which direction the victim's head was facing (west) (*id.* at 98-99). Ortenblad thought the other man was standing near the victim's stomach or hips. (*Id.* at 100-101.) She then heard three or four more shots. (*Id.* at 110.) The man with the gun then, as she testified earlier, hopped around the car to get into the driver's seat. (*Id.* at 111.) She also indicated

on the diagram where the red car and the blue Cadillac were located—next to each other at gas pumps. (*Id.* at 106, 108-10.) From her vantage point, she could see the victim from approximately right below the armpit and up. (*Id.* at 104.) She testified that the person was motionless. (*Id.*)

*Amardeep Khehra*

Amaradeep Khehra is a manager at a Citgo gas station on North Teutonia Avenue. (*Id.* at 114.) His uncle owns the gas station, and Khehra has been working there since April 2002. (*Id.*) He was working by himself on February 16, 2008 from 8:00 a.m. to 8:00 p.m. (*Id.* at 114-15.) Khehra testified he works at the cash register, which is behind bulletproof glass. (*Id.* at 115.) There is a small opening where people hand in money. (*Id.*) Khehra testified that from where he works, he is able to look out of the window and see all of the pumps. (*Id.* at 115-16.) On February 8, 2016, a blue Cadillac pulled into the station and parked at pump eight. (*Id.* at 116.) Someone from the Cadillac came into the store and bought a cigar. (*Id.*) He recognized the person as having been in the store before. (*Id.* at 116-17.)

Khehra testified that between 12:32 and 12:40 p.m., he heard gunshots. (*Id.* at 117.) At the time he heard the shots, the Cadillac had pulled into the gas station and the person who came into the store had come in and then left. (*Id.* at 117-18.) Khehra remembered a total of four shots. (*Id.* at 118.) After he heard the first two, he looked out the window and saw a gun in someone's hand in the air. (*Id.*) He then dialed 911. (*Id.*) The person holding the gun was facing away from Khehra and toward the pump and Teutonia, standing to the left of the blue Cadillac. (*Id.* at 118, 125.) Khehra testified that there was a person behind the man holding the gun who was trying to get the gun. (*Id.* at 120.) His right hand was over the person who was holding the gun's right hand, struggling to get

the gun. (*Id.* at 120-21.) Two other people ran away from the scene; they had been with the victim. (*Id.* at 138.) The two men struggling "were joined totally." (*Id.* at 143.)

Once Khehra heard the shots, he saw another car—a maroon color Oldsmobile—had pulled up to pump nine. (*Id.* at 122.) He heard two more shots and ducked down. (*Id.* at 127.) When he stood back up, he saw a body lying on the ground and another person limping to his car by pump nine. (*Id.*) The person on the ground was the person trying to grab the gun from the person holding it. (*Id.* at 127-28.) The person who was limping was limping on his right leg. (*Id.* at 129.) He got back into his vehicle and drove away, going west on Hampton. (*Id.*) The 911 operator asked Khehra to check on the condition of the victim, so Khehra went outside. (*Id.* at 130-31.) The victim was not moving or breathing. (*Id.* at 131.) Khehra testified that on February 20, 2008, a detective came to the gas station to retrieve a video that captured the incident. (*Id.*)

*Erik Villarreal*

Erik Villarreal is a detective with the Milwaukee Police department and, at the time of the trial, had worked for the department since 1991 and been a detective since 1998. (Tr. of Jury Trial, June 19, 2008 p.m., Docket # 13-15 at 11.) Villarreal had been working as a homicide detective for approximately five years. (*Id.*) On February 16, 2008, Villarreal responded to a Citgo station on the corner of West Hampton Avenue and North Teutonia Avenue to investigate the scene. (*Id.* at 12.) Villarreal testified that investigating entails processing the scene for evidence. (*Id.*) In processing the scene, evidence was collected and photographs were taken. (*Id.*)

Villarreal testified that he observed the victim, who was found in a supine position on his back with multiple gunshot wounds. (*Id.* at 13.) He testified that the victim had a gunshot wound under his right armpit, in his back, and in his head. (*Id.* at 14.) The victim's head was facing northeast and

his feet were facing southwest. (*Id.* at 16.) During the course of the investigation, he learned that the blue Cadillac parked at the gas station was the victim's car or the car the victim was in. (*Id.*)

In going through photographs of the scene, Villarreal identified a photograph that depicted two holes in the window of the rear passenger side door. (*Id.* at 19, 21.) As to one of the holes, he testified it appeared that a gunshot or gunshots passed through the window and struck the roof of the car. (*Id.* at 21.) He was not able to determine what caused the second hole. (*Id.* at 21-22.) Villarreal testified that he believed, based on his training and experience, that the shot that hit the roof of the car would have come from below the window. (*Id.* at 23.) Villarreal also testified that the location of the bullet casings was indicative of where the shots were fired (the passenger side of the blue Cadillac), and that a possible shoe impression was left on the right front quarter panel of the car, which could indicate a struggle occurred. (*Id.* at 24-25, 29.) In the trunk of the car, officers found a receipt for the purchase of a .45 caliber pistol. (*Id.* at 33.) The casings found at the scene were 9 millimeter casings. (*Id.* at 34.) Villarreal testified that they also found AAA Duracell batteries and Swisher Sweet cigars in the victim's car. (*Id.* at 34-35.) Once the majority of the scene investigation was completed, Villarreal had the victim's car moved because he believed the car had been hit with a bullet during the incident. (*Id.* at 36.) He did locate a bullet underneath the car. (*Id.*)

During his testimony, Villarreal left the witness stand to explain a diagram he completed in the course of his investigation. (*Id.* at 42.) He testified that the incident took place mostly near pump seven. (*Id.* at 43.) Casings recovered from the scene showed that there was a lot of movement as to where the gun was located. (*Id.* at 74.) Villarreal could not say if one person was moving around with the gun or two people were struggling with the gun; the casing were not conclusive as to who had the gun and where. (*Id.* at 78.) Blood found near another pump (pump nine) belonged to Shirley. (*Id.*

at 59.) Villarreal testified that Shirley was not at the scene when he arrived nor at any time while he was there investigating the scene (for several hours). (*Id.* at 76.)

*Scott Gastrow*

Scott Gastrow is a homicide detective with the Milwaukee Police Department. (*Id.* at 83-84.) At the time of the trial, he had worked for the department for 23 years, as a detective for 13 years, and as a homicide detective for six. (*Id.* at 84.) In working on the investigation that involved Shirley, he interviewed witnesses at the scene, including Jaquell Hawthorne and Angela Ortenblad. (*Id.* at 84-85.) He note that he took Ortenblad back to the scene to have her show them exactly where she was positioned inside her vehicle. (*Id.* at 85.) They parked the squad car where Ortenblad stated her car was stopped and then took photographs. (*Id.* at 85-86.) Gastrow testified that he was also the officer that showed the photo array to Hawthorne, who identified Shirley. (*Id.* at 89-90.)

*Michele Kemp*

Michele Kemp testified that on February 16, 2008, she stopped at the Citgo gas station on the corner on Teutonia and Hampton to buy a bag of chips. (Tr. of Jury Trial, June 20, 2008 a.m., Docket # 13-16 at 11-12.) She testified that she went in through the entrance closer to Hampton, and as she entered, she heard a couple of noises. (*Id.* at 12.) She did not know what the noises were. (*Id.*) Then, she heard a couple more, glanced and saw a couple of people, one of whom had just fallen down. (*Id.*) Kemp testified she could remember that there were cars in the lot when she pulled up; she knew there was one between pumps two and four and another between seven and eight. (*Id.* at 13.) There was also a "card that was along the side," which kept her from going in the first entrance. (*Id.*) A blue Cadillac was parked closer to the pump when she pulled into the lot. (*Id.* at 13-14.)

Kemp testified that she heard the first shots when she was pulling into the lot. (*Id.* at 16.) She stopped once she realized what she was hearing was gunshots. (*Id.*) She saw two people at the pumps in front of the corner of the building. (*Id.* at 17.) Kemp could not describe either person, though she again noted that one of them fell or "dropped down." (*Id.*) This person's back was towards her, and the other person was in front of him and facing toward her. (*Id.* at 17-18.) She testified she did not remember many details because everything happened so fast. (*Id.* at 18.) She heard a "total of maybe five shots." (*Id.* at 19.) She heard the first two, stopped driving, heard another, and then ducked down because she realized she was hearing gunshots. (*Id.*) When she peaked up again, she saw two people running past—one in front of the other. (*Id.* at 20.) After that, she assumed everything was okay and drove around and parked in front of the store. (*Id.* at 21.)

*Susan Noll*

Susan Noll is a forensic scientist in the DNA Analysis Unit at the Wisconsin State Crime Lab. (*Id.* at 25.) Noll analyzed a dry blood stain taken from Perry, a swab of a stain collected from the passenger door of the car, swabs of stain from the ground near pump seven, a swab from a stain collected from the ground six feet west of pump nine, swabs of a stain collected from the ground eight feet west of pump nine, and a buccal swab from Shirley. (*Id.* at 28.) The swabs collected from the passenger door and the ground near pump seven matched Perry. (*Id.* at 28-29.) Blood from the swab taken from the ground six feet west of pump nine matched Shirley. (*Id.* at 29.) As for the swab from the blood stain eight feet west of pump nine, Noll testified that though blood was identified, a DNA profile could not be developed due to the small amount of DNA present. (*Id.* at 30.)

*Dr. Wieslawa Tlomak*

Dr. Wieslawa Tlomak is an assistant medical examiner at the Milwaukee County Medical Examiner's Office. (*Id.* at 34.) Dr. Tlomak testified that she did not perform the autopsy on Perry; another doctor, who had since left the office, performed it. (*Id.* at 36.) She reviewed that doctor's notes, autopsy protocol, and looked at pictures taken during the autopsy. (*Id.* at 37.) Dr. Tlomak testified that she did go to the scene, however. (*Id.*) She stated that when she got to the scene, Perry was lying on his back in front of the gas station. (*Id.*) When she examined Perry at the scene, she saw at least three gunshot wounds. (*Id.*) One of the wounds was on the right side of his chest and another was in the right armpit. (*Id.* at 37-38.) Dr. Tlomak testified that a toxicology report reflected that Perry had alcohol in his system (".18 gram percent" in his blood and .14 in his vitreous fluid) as well the active and inactive metabolite of THC. (*Id.* at 39.)

The autopsy report stated that Perry had three penetrating wounds and one superficial wound. (*Id.* at 42.) Dr. Tlomak could not determine the range at which the shot that caused the superficial wound was fired. (*Id.* at 46.) Among the three wounds was a gunshot wound to the head, in which the bullet entered at the back of the head two and one fourth inches below the top of the head. (*Id.* at 43.) Dr. Tlomak testified that stippling around the head wound, as well as gunpowder particles, showed that the shot was fired at an intermediate range—about 18 to 24 inches. (*Id.* at 43-44.) The trajectory was back to front, right to left, and downward. (*Id.* at 45.) The downward projection was at 60 degrees. (*Id.* at 65.) Dr. Tlomak explained that the 60 degree downward angle is determined by imagining a plane parallel to the top of the head going through the gunshot wound and then drawing another line to the bullet and measuring the angle between them. (*Id.*) Dr. Tlomak testified that Perry also had a gunshot wound to the chest. (*Id.* at 47.) The trajectory was front to

back, right to left, and downward. (*Id.*) The right to left angle was 60 degrees, and the downward angle was 30 degrees. (*Id.* at 67.) There was no soot or stippling around the chest wound. (*Id.*) The range at which the gun was fired was indeterminable. (*Id.* at 84.) Stated differently, it was not at close or intermediate range; it was fired from farther away, the exact distance of which was not known. (*Id.* at 85.) When asked whether the angles showed how the gun would be positioned relative to the body, Dr. Tlomak replied, "This is the reason that I don't use angles because those angles are measured when the body was lying face up on the autopsy table. I don't know the position of the body at the scene. So I cannot tell you how the gun was located relating to the body." (*Id.* at 67.)

As for the gunshot to Perry's right armpit, there was no soot or stippling. (*Id.* at 48.) The trajectory was right to left, front to back, and upward. (*Id.*) As with the chest wound, the range from which the shot was fired was indeterminable. (*Id.* at 84.) Dr. Tlomak testified that this gunshot did not go through any organs that would cause death. (*Id.* at 69.) During the autopsy, the doctor performing the autopsy found 800 milliliters of blood (a little over three cups) in the right chest cavity and 750 milliliters of blood (three cups) in the left chest cavity. (*Id.*) She testified that in order for that amount of blood to spill out into the chest cavity, the heart would still have to be beating. (*Id.* at 70.) She also testified that a person could still struggle with this injury. (*Id.* at 71, 72.) When asked if a person could continue to struggle with the armpit wound, the superficial wound to his hand, and the chest wound, Dr. Tlomak stated that the person could. (*Id.* at 72.) Dr. Tlomak testified that Perry also had "minor blunt force injuries" on both knees, as well as abrasions. (*Id.* at 50.) She agreed that these injuries could have been sustained during a struggle. (*Id.* at 73.) She testified that Perry's cause of death was multiple gunshot wounds. (*Id.* at 52.)

*Mark Simonson*

Mark Simonson is a fire and tool mark examiner at the state crime lab in Milwaukee. (*Id.* at 89.) Simonson testified that he examined numerous .40 caliber cartridge cases and was able to determine that they were all fired from the same gun. (*Id.* at 91-92.) He also examined three fired bullet jackets and two fired jacketed hollow point bullets and was able to determine that all but one of the hollow point bullets (which was too impacted from hitting its target) were fired from the same rifle barrel. (*Id.* at 94-95.) Simonson also testified that examination of the items revealed characteristics similar to a .40 caliber semiautomatic pistols manufactured by Glock. (*Id.* at 97.) When asked if the gun on the receipt found in the car (a Taurus Model 1911 pistol) could have fired the cartridges he examined, Simonson stated that it could not have, first and foremost because that gun uses a different caliber bullet. (*Id.* at 98-99.) Simonson testified that he never received a gun to test. (*Id.* at 99.)

*Richard W. Shirley*

At the time of the trial, Shirley was 21-years-old. (Tr. of Jury Trial, June 20, 2008 p.m., Docket # 13-17 at 26.) He had a high school diploma and was self-employed. (*Id.*) He had been shot in the leg by a stray bullet and, as a result, had his leg amputated. (*Id.* at 26-27.) Prior to having his leg amputated, he was in an apprenticeship for plumbing. (*Id.* at 26.) Shirley testified that he was shot in the leg on August 26, 2007, and it had nothing to do with the events at issue in the trial. (*Id.* at 27.) After trying around 17 or 18 surgeries, the doctors determined they could not save it, and Shirley's leg was amputated from below the knee. (*Id.* at 27-28.)

Shirley testified that he received a prosthesis on February 1, 2008. (*Id.* at 28.) On the day of the event, Shirley testified that though he was using both crutches and a cane, he only had his cane

with him. (*Id.*) However, he did not have the cane when the incident transpired. (*Id.*) Shirley explained that you have to go through a rehabilitation process and are given a temporary prosthesis; you basically need to learn to walk again. (*Id.* at 29.) On February 16, 2008 at the Citgo station, he was making an effort to walk using only the temporary prosthesis. (*Id.*)

Shirley agreed that he was at the Citgo station on February 16, 2008 between 12:40 and 1:00 in the afternoon. (*Id.*) He testified that he went there because he knew Udalius McCloud and Jaquell Hawthorne, and they had called him to buy his stereo system. (*Id.* at 30.) Since having his leg amputated, he worked installing car stereos. (*Id.*) Shirley testified that they set up a meeting place so that he could sell them the system. (*Id.*) He was driving a maroon, 1988 Oldsmobile, and McCloud and Jaquell were in a 1994 Cadillac sedan. (*Id.* at 31.) Prior to going to meet McCloud and Hawthorne, Shirley had been at Warehouse Music, where he ran into someone he knew from high school named Jeremy. (*Id.* at 36, 38.) Jeremy accompanied him in the car because he asked Shirley for a ride to 42nd and Hampton, which Shirley testified was on his way. (*Id.* at 37.) Jeremy was in Shirley's car when he pulled into the gas station. (*Id.*) He spoke briefly with McCloud and Perry, who complimented his jeans. (*Id.* at 38.) He then went into the gas station but Shirley did not see him again. (*Id.* at 37.)

Originally, they were supposed to meet at Advanced Auto Parts, which was directly east of the gas station. (*Id.*) Shirley explained that part of the deal was that he was going to install the system, so meeting at Advanced Auto Parts would have allowed him to get any necessary parts to install the system. (*Id.* at 31-33.) He explained that since his amputation, he did not go to a gas station that did not have full service. (*Id.* at 33.) When he pulled into the gas station, he had already seen McCloud's and Hawthorne's car pull into the gas station. (*Id.* at 33-34.) When he pulled in, they

were already parked at pump eight, so he pulled up along side of them, closer to pump nine. (*Id.* at 34.) Shirley testified that as soon as he pulled up, McCloud, Hawthore, and Perry got out of their car and they came over to the trunk of his vehicle. (*Id.* at 34-35.) They told Shirley that he was going to install the system before they were going to pay him. (*Id.* at 35.) He told them it would take him at most half an hour. (*Id.*)

Shirley got back into his car to play music over the sound system. (*Id.* at 39.) He testified that prior to coming to the gas station, he did not have a gun. (*Id.* at 40.) McCloud was sitting in the driver's seat and Perry was in the front passenger seat. (*Id.*) McCloud asked Perry to look at the speaker in his front passenger side because it was not working. (*Id.* at 40-41.) Shirley testified that when he got to the front of the car and opened the passenger door, Perry put a gun in his face. (*Id.* at 41.) Perry asked Shirley for his keys and for the $400 he had just given him. (*Id.*) Shirley testified that he complied; Perry fired the gun and it hit Shirley in the hand/finger. (*Id.* at 41-42.) Shirley said that he was not sure at first whether Perry was trying to scare him or actually shoot him. (*Id.* at 43.)

Once he had been hit in the hand, Shirley testified that he tried to reach at Perry and grab the gun. (*Id.*) Then, they "started tusslin' over the gun, and it all happened so fast." (*Id.* at 44.) Shirley testified that he had only had his prosthetic leg for 15 days and did not really have balance. (*Id.*) He testified that he and Perry went to the ground, and he remembered hearing window shatter and then several more shots. (*Id.* at 44-45.) Perry was behind him and clawing at his neck. (*Id.* at 45.) Shirley's attorney introduced an exhibit that showed markings on the left side of Shirley's neck, which were still visible at trial. (*Id.* at 46.) Shirley testified that Perry inflicted them when he was behind him and had him in a headlock. (*Id.*) At that time, neither of them had two hands on the gun. (*Id.*) Shirley testified that he tried to get up off the ground and had the gun in his hand, at which point Perry came

from behind and grabbed his hand. (*Id.* at 48.) At some point, Perry grabbed for the middle of the gun and it discharged. (*Id.* at 49, 53.) That is, Perry reached for the gun and hit the trigger. (*Id.* at 53.) When Perry fell back, Shirley also fell back and then got up off the ground and grabbed the gun. (*Id.*) Shirley testified that Perry did not fight any more after that. (*Id.* at 49.) Shirley testified that he was afraid for his life. (*Id.* at 49-50.) He also testified that he sustained a gash on the left rear portion of his head; he was not sure if a bullet grazed him or he hit his head on the concrete. (*Id.* at 50-51.) Shirley acknowledged at some point before leaving the scene, he was standing above Perry's body holding the gun; but Perry was already dead. (*Id.* at 52.)

Once Shirley got off the ground, he tried to hop on his car on his right leg. (*Id.* at 54.) Hopping on his prosthesis, he said, would be nearly impossible. (*Id.*) He then went to his cousin's house, who suggested Shirley take some pictures. (*Id.*) He stayed at his cousin's house until early in the morning. (*Id.*) There was blood all over his car from his hand, and when he went back out to the car that morning, the windows were busted; several winter hats, all of his CDs, and the gun were all stolen. (*Id.* at 55.) He then drove to his dad's house in Indiana. (*Id.*) Both of his parents told him to turn himself in, and Shirley testified that he wanted to. (*Id.*) He called his attorney, who was on vacation. (*Id.*) Shirley was arrested on February 23, 2008. (*Id.* at 81.)

*Sentencing Hearing and Post-Trial Proceedings*

As stated earlier, the jury convicted Shirley of the lesser included offense of first-degree reckless homicide. At sentencing, following arguments from the State and Shirley's attorney, as well as statements from Perry's family members, Shirley's mother, and Shirley himself, the judge sentenced Shirley to 35 years: 25 years of initial confinement followed by 10 years of extended supervision, to run consecutive to any other sentence. (Tr. of Sentencing Hrg., Docket # 13-19 at 41-

62.) Shirley filed post conviction motions, which were denied. Shirley appealed to the Wisconsin Court of Appeals and his conviction was affirmed. The Wisconsin Supreme Court denied his petition for review. Subsequently, Shirley timely filed this federal petition for habeas corpus.

## ANALYSIS

Shirley's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(a). Under AEDPA, when a state court decides a case on the merits, a federal court can grant a writ of habeas corpus only if the state court's decision was contrary to clearly established Supreme Court precedent, involved an unreasonable application of such precedent, or was based on an unreasonable determination of the facts in light of the evidence presented in state court. *Promoter v. Pollard*, 628 F.3d 878, 888 (7th Cir. 2010); 28 U.S.C. § 2254(d). In this case, Shirley raises two grounds for habeas relief. First, he argues that shackling him to the witness stand over his attorney's objection and after at least one juror observed him shackled during jury selection had a substantial and injurious effect on the jury's verdict and his sentence. Second, Shirley argues that the Wisconsin Court of Appeals was unreasonable in denying resentencing based on the trial court's reliance on inaccurate information.

1.     *Shackling to the Witness Stand*

1.1     Application of *Deck v. Missouri*, 544 U.S. 622 (2005)

At trial, Shirley was confined to a wheelchair and his legs were shackled. (Ct. App. Dec. in 2012AP263-CR, Docket # 1-1 at 2.) Both counsel tables were draped with a cloth that reached the floor, intended to prevent the jury from seeing the shackles. (*Id.*) During *voir dire*, one juror (Juror 34) noticed the restraints. (*Id.*)

During *voir dire*, Shirley's counsel asked, "Does anybody else believe that because he's sitting here, and you haven't heard the facts yet, does anyone else believe that Mr. Shirley must have done something wrong?" (Tr. of Jury Trial, June 17, 2008 a.m., Docket # 13-12 at 11.) Several jurors raised their hands, including Juror 34. (*Id.* at 11-12.) When asked to explain why he believed Shirley had done something wrong, Juror 34 responded, "Well, I didn't hear nothing that said he intentionally took the life of somebody, but if he's sitting here in cuffs, he did something." (*Id.* at 12.) The remainder of *voir dire* continued without further discussion of Juror 34's mentioning seeing Shirley's shackles. (*Id.* at 12-55; Ct. App. Dec., Docket # 1-1 at 3.) Once the jury was excused, the State brought up Juror 34's comments and expressed concern over the juror's comments. (Docket # 13-12 at 56-57.) The prosecutor stated that she was not sure how many people heard the juror say that he saw the defendant in cuffs and said, "I have a problem with the entire panel being tainted by that." (*Id.* at 57.) When asked for his input, Shirley's counsel noted, "Well, you know, this is a huge problem that's been created by some really bad policy in the sheriff's department. I'll put that on the record." (*Id.*) Counsel later stated that he had not heard Juror 34 make the statement; the court did not hear it, either. (*Id.* at 58.)

The court asked the court reporter to type up Juror 34's statement, and following a brief recess, Shirley's attorney stated that Shirley was comfortable going forward as long as additional *voir dire* with Juror 34 was allowed. (*Id.* at 60-61.) Counsel also requested that the court read an instruction regarding the presumption of innocence to the entire panel. (*Id.* at 61-63.) The court agreed to bring in Juror 34 for further questioning. (*Id.* at 64.) When asked what he meant by his comment, Juror 34 responded, "Basically, what I mean by that response is, you know, he wouldn't

be here if he wasn't involved in a situation . . . . Basically, that's all I meant." (*Id.* at 65-66.) Then,

both the court and Shirley's attorney spoke with Juror 34:

> THE COURT: That's all you meant. All right. So you meant he wouldn't be sitting at that table?
>
> JUROR 34: Right.
>
> THE COURT: Okay. Because physically he's not in cuffs. You know, he doesn't have handcuffs on. Did you make an observation about him that–
>
> JUROR 34: Well, I guess, I was sitting behind him yesterday, and I noticed he had something on his feet.
>
> THE COURT: Okay.
>
> SHIRLEY'S ATTORNEY: Oh, it's his prosthetic.
>
> JUROR 34: Oh, okay.
>
> THE COURT: Okay. Well, let's see what the juror understands.
>
> SHIRLEY'S ATTORNEY: I'm sorry.
>
> THE COURT: So you noticed something about his leg?
>
> JUROR 34: Right.
>
> THE COURT: His right leg, left leg?
>
> JUROR 34: But you can't make any assumptions, you know, on the case. I ain't heard no evidence.
>
> THE COURT: Okay. So you're saying you made a physical observation about his leg; what did you observe?
>
> JUROR 34: Well, it looked liked he had cuffs on or something.

(*Id.* at 66-67.) The court then asked Juror 34 if he said anything to his fellow jurors, to which he

responded no. Shirley's attorney did not ask any follow-up questions. (*Id.* at 67.) Shirley's attorney

asked whether what Juror 34 believed he saw the previous day biased or prejudiced him against

- 22 -

Shirley in any way. (*Id.* at 68.) Juror 34 denied that it had. (*Id.*) The prosecutor then requested that the court instruct the juror "that he should not discuss anything that we discussed with the other jurors, including anything that [Shirley's attorney] said about the defendant's leg with the other jurors." (*Id.*) Juror 34 responded that he understood. (*Id.*)

Shirley's attorney told the court that he was "satisfied" with Juror 34's response and did not want to speak to any other jurors who had the same vantage point as Juror 34 and may have seen Shirley's ankles. (*Id.* at 69.) Shirley confirmed that he had no objection to proceeding with the panel. (*Id.* at 70.)

Later in the trial, the issue of Shirley being in shackles came up again. This time, in the context of Shirley testifying and being on the witness stand. Following a colloquy with Shirley to ensure that he understood it was his right to not testify at the trial, the judge stated:

> So having said that - - I also informed counsel that there is still - - there is an issue with regards to security that I defer to the sheriff's department with regards to that matter.
>
> That based on current status, that he'll [Shirley] be moved up here prior to the jury coming in, that he will be secured while he is in this location. It's still anticipated he'll rise when the jury comes in, sit down when the jury is in place.

(Docket # 13-17 at 24.) Following a discussion off the record, the judge added:

> We're back on the record. I would note that counsel appealed the earlier decision to a higher authority in the sheriff's department who said that it is the sheriff's department policy to have defendants restrained when they're in that location in this particular situation. Having said that, are - - is everybody ready to proceed at this point?

(*Id.* at 25.) Shirley's attorney responded, "Yes, and Your Honor, preserving Mr. Shirley's Sixth Amendment issue and - - and, further, his Fifth Amendment issues with respect to being chained to the floor during the course of this trial." (*Id.*)

On appeal, Shirley argued that he was denied his right to a fair trial and to the appearance of a fair trial because at least one juror saw his restraints, which tainted the presumption of innocence. Shirley also argued that the restraints inhibited his ability to adequately present a defense. (Ct. App. Decision in 2012AP263-CR, Docket # 1-1 at 5.) The court of appeals wrote that despite searching the record, it could not locate an explanation from the trial court about why Shirley was required to be restrained. (*Id.* at 6.) The court referenced the statement cited above—that there was "an issue with security" and that the trial court would defer to the sheriff—as the only indication as to why Shirley was shackled. (*Id.*) It stated further that the court's summation of the off the record conversation did not explain what "that location" or "particular situation" was. (*Id.*) The court of appeals wrote that while a trial court's decision to shackle a defendant without making a particularized determination is an erroneous exercise of discretion, a defendant must also show that the presence of the restraints prejudiced him in the eyes of jury to be entitled to a new trial. (*Id.* (citing *State v. Miller*, 2011 WI App 34, ¶ 7, 331 Wis. 2d 732, 797 N.W.2d 528.)) Ultimately, the court of appeals found that the trial court's failure to explain why shackling Shirley was necessary was not reversible error. (*Id.*) "Not only does the record show that Shirley failed to strike the one juror that the record demonstrates saw the restraints, it also shows that no objection to the shackling was raised until Shirley was about to take the witness stand." (*Id.* at 6-7.) The court found that Shirley, by failing to timely object, forfeited his objection to appearing before the jury in shackles. (*Id.* at 7.) It went on to say that Shirley had not demonstrated prejudice, pointing out that Shirley's attorney consulted both with Shirley and with Shirley's family and decided to proceed with the jury panel, that Juror 34 was instructed not to discuss his observation with any other juror, and that there was no indication in the record that any other jurors saw Shirley in shackles. (*Id.* at 7-8.)

Shirley argues that the court of appeals improperly stated and unreasonably applied federal law, specifically *Deck v. Missouri*, 544 U.S. 622 (2005) and unreasonably determined the facts in light of the evidence presented to it. (Docket # 16 at 16.) The respondent argues, however, that Shirley procedurally defaulted the portion of his shackling claim based on Juror 34's observation that Shirley was wearing leg shackles during *voir dire*. (Docket # 18 at 1.) The respondent further argues that insofar as Shirley's shackling claim is limited to the trial court's decision to keep him shackled to the witness stand during his testimony, *Deck* is not the applicable legal standard and that there is no controlling Supreme Court precedent about shackling during testimony that the court of appeals unreasonably applied. (*Id.*)

I will begin with determining whether the court of appeals should have applied *Deck* and whether, if so, its application of that precedent was unreasonable. In *Deck*, the defendant was convicted and sentenced to death. 544 U.S. at 624. The State then held a new sentencing proceeding, and Deck was shackled with leg irons, handcuffs, and a belly chain from the first day of the new proceeding. *Id.* at 625. Deck's counsel objected prior to and during *voir dire* as well as once following *voir dire*. He was overruled each time. *Id.* Deck was again sentenced to death and appealed, claiming that his shackling violated both Missouri law and the federal constitution. *Id.* The Court found that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Id.* at 629. Thus, "where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict

obtained.'" *Id.* at 634 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). *Deck*, therefore, addresses situations where a defendant's shackles or restraints will be visible to the jury. *See, e.g.*, *Byers v. Basinger*, 610 F.3d 980, 989 n.6 (7th Cir. 2010) ("[A] defendant may advance a Fifth Amendment due process claim based on evidence that he was wearing *visible restraints* at trial . . . .") (emphasis added); *Johnson v. Gaetz*, 743 F. Supp. 2d 820, 825 (N.D. Ill. 2010) ("Accepting that the belt was not visible to the jury, I cannot say the state appellate court's decision to affirm on this issue was contrary to any clearly established federal law, because there is no clearly established federal law regulating the use of restraints that are not visible to a jury.")

The respondent argues that the only instance in the record where Shirley's restraints were seen was when Juror 34 reported during *voir dire* that he had seen that Shirley's legs were shackled. Shirley concedes his federal habeas argument concerns being shackled during his testimony (*see* Supp. Br. Responding to Answer, Docket # 14 at 1-2), and the respondent argues that Shirley cannot rely on the incident with Juror 34 because the court of appeals found that he forfeited his general argument about appearing before the jury in shackles and it is therefore procedurally defaulted. That is, Juror 34's report of seeing Shirley's shackles is the only record that a juror saw Shirley's shackles. If Shirley cannot rely on Juror 34's observation, *Deck* would be inapplicable. Therefore, whether *Deck* is applicable (or potentially applicable) depends upon whether Shirley is permitted to rely on Juror 34 reporting that he saw Shirley in shackles.

Unfortunately for Shirley, his attorney did not object to the fact that Juror 34 saw his restraints. Recall that Shirley's attorney told the court that he was "satisfied" with Juror 34 and did not want to speak to any other jurors who had the same vantage point as Juror 34 and may have seen Shirley's ankles. (Docket # 13-12 at 69.) Shirley himself confirmed that he had no objection to

proceeding with the panel. (*Id.* at 70.) On this record, the court of appeals concluded that Shirley forfeited his objection to appearing before the jury in shackles.

A claim is procedurally defaulted when a state court does not reach a federal issue because of a state procedural bar. *Jenkins v. Nelson*, 157 F.3d 485, 491 (7th Cir.1998). In order to conclude that a petitioner has procedurally defaulted a claim due to an adequate and independent state ground, this Court "must be convinced that the last state court to consider the question actually relied" on a procedural ground "as the basis for its decision." *Braun v. Powell*, 227 F.3d 908, 912 (7th Cir. 2000) (internal citations omitted). The state court's reliance on a procedural rule therefore must be explicit. *See id.* Furthermore, to be an adequate ground of a decision, the state's procedural rule must be "firmly established and regularly followed," applied in a "consistent and principled way," and the petitioner must be deemed to have been fairly apprised of its existence at the time he acted. *Id.* (internal quotations and citations omitted). A procedural default will bar federal habeas relief unless the petitioner can demonstrate both cause for and prejudice stemming from that default or he can establish that the denial of relief will result in a miscarriage of justice. *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004) (citing *Wainwright v. Sykes*, 433 U.S. 72, 86–87 (1977)).

In this case, the court of appeals found that Shirley forfeited his objection by failing to make a timely objection to appearing before the jury in shackles. The contemporaneous objection rule has been found to be an adequate and independent state ground precluding habeas relief. *Dressler v. McCaughtry*, 238 F.3d 908, 912-13 (7th Cir. 2001); *Turner v. Pollard*, No. 13-CV-731, 2014 WL 5514169, at *7 (E.D. Wis. Oct. 31, 2014). Additionally, although the court of appeals addressed the merits of the shackling issue, the use of the word "further" preceding its analysis on the merits indicates the alternative nature of its holding. "A state court may reach the merits of a federal claim

in an alternative holding; if it does so explicitly, then the independent and adequate state ground doctrine 'curtails reconsideration of the federal issue on federal habeas.'" *Moore v. Bryant*, 295 F.3d 771, 775 (7th Cir. 2002) (quoting *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)). Accordingly, because the court of appeals found this issue was forfeited, it is procedurally defaulted absent a showing of cause and prejudice or that the denial of relief will result in a miscarriage of justice, which Shirley has not attempted to show.

Notwithstanding this procedural default, recognizing that *Deck* only applies to cases where shackles or restraints are visible to the jury, Shirley suggests that I can consider that the shackles were visible to Juror 34 in analyzing his claim that he was shackled while testifying. However, Shirley cites to no authority that allows a habeas review court to consider a procedurally defaulted claim in analyzing a non-defaulted claim. Although Shirley objected to testifying while restrained, he did not link his objection to the earlier incident of Juror 34 observing the restraints as he does here on habeas review. Absent consideration of Juror 34, there is no evidence in the record that Shirley's restraints while testifying were visible to the jury. Consequently, *Deck* would not apply in this case and would not be a basis for granting Shirley habeas relief.

### 1.2 Shirley's Ability to Defend Himself

Beyond *Deck*, Shirley argues that testifying while restrained affected his ability to defend himself. Shirley notes that the jury saw six witnesses move freely and approach the exhibits, but he was unable to approach the exhibits while testifying. He argues that being shackled frustrated his ability to articulate facts during cross-examination, hampered his ability to demonstrate key events, and prevented him from showing the jury how he functions with his prosthetic leg.

On federal habeas review, Shirley has to show not just that he disagrees with the court of appeals' decision, but that the court of appeals' decision was contrary to, or an unreasonable application of, established federal law. On this issue, the court of appeals found that though it could not discern any reason for restraining Shirley while on the witness stand, it could not conclude that the restraints prohibited Shirley from participating in his own defense. The court of appeals found that the record shows that during Shirley's testimony, Shirley was able to direct his counsel's hand to exhibits and was able to point to certain exhibits himself. The court of appeals noted that Shirley did not inform the trial judge that being able to approach the exhibits would pose a difficulty nor did Shirley asked the trial judge for any accommodations regarding exhibits. The court of appeals concluded that, "The record reflects that Shirley is intelligent and articulate, and seemingly had little difficulty communicating while on the witness stand." (Docket # 1-1 at 8.) While, like the court of appeals, I cannot discern any reason for restraining Shirley while on the witness stand (other than a reference to a Sheriff Department policy), after careful review of the record, I find that the Wisconsin Court of Appeals' decision that Shirley's restraints did not inhibit his ability to participate in his defense was not contrary to, nor an unreasonable application of, clearly established law. Further, I find that the decision does not rest upon an unreasonable determination of the facts in light of the evidence. Thus, Shirley's petition for a writ of habeas corpus on this ground will be denied.

2.      *Re-Sentencing*

Shirley's second argument is that the court of appeals' decision denying his claim that the trial court relied on inaccurate information in imposing its sentence was based on an objectively unreasonable determination of the facts. At sentencing, the State argued that Shirley stood over Perry after he had fallen and shot him in the head. (This was not its argument at trial.) Recall that Shirley

testified that Perry was shot in the head when Perry reached up to grab the gun from Shirley's hand.

In sentencing Shirley, the court made two relevant remarks:

> But one of the things I noted was, and it wasn't something I struggled with, it was something I looked at, because there was this demonstration, and it talked about, because we had forensic information, we had angle, we had trajectory, we had stippling, we had distance, and if I put all that together that rendition in my mind of what was purported to potentially have occurred, I didn't see how physically it could have occurred. Because your arms would have to be feet longer than they were. You'd have to be more flexible than probably the most flexible gymnast.
>
> It was just- - I looked at that, and I'm old enough to say that I don't think anything is impossible, but sometimes things stretch the realm of practical possibility. So I looked at that, and I remember that, and I remember that testimony, specifically, from this event.

(Tr. of Sentencing Hrg., Docket # 13-19 at 46.) Later, the court remarked:

> Is there any question in my mind that there was a struggle? No, there's no question in my mind, you know. I know that you were injured as a result of this, and I know that Mr. Perry was killed. And there was discussion about rolling around outside the car next to the gas pumps, everything that went on. And I do take a look at that, and I say, well, some of that, yeah, I can see how some of this could have occurred.
>
> But then, conversely, I still struggle with the other gunshot to the back of the head because physically I don't see how that could have occurred as described other than being in a different position as described - - than as described.

(*Id.* at 50-51.) During post-conviction proceedings, Shirley sought the help of an expert to help the court visualize what Shirley had described orally. The report not only rebutted the State's assertion that Shirley shot Perry execution style, it also provided a visual demonstration. (Docket # 2 at 26-27.) On appeal, the court of appeals found:

> With regard to Shirley's contention that the trial court relied on inaccurate information as to how Perry was shot, we conclude that Shirley's argument, in essence, is a rehashing of his trial testimony. Although Shirley submitted a report allegedly demonstrating the possibility of his version of event, the jury heard Shirley's testimony and rejected it. The trial court did not rely on inaccurate information by not believing Shirley's account.

(Docket # 1-1 at 10.)

As noted above, Shirley argues that the court of appeals unreasonably determined and applied the facts and that he is entitled to resentencing under *Townsend v. Burke*, 334 U.S. 736 (1944). In *Townsend*, the defendant entered pleas to two charges of robbery and two charges of burglary and was sentenced. *Id.* at 737. Townsend was unrepresented when he entered his pleas and when he was sentenced. *Id.* at 738-39. The Court noted that though it had recently decided that state courts are not prohibited from taking guilty pleas from unrepresented defendants, a defendant's due process rights can be violated if his not being represented prejudices him. *Id.* at 739. At Townsend's sentencing, the judge recited Townsend's prior convictions in a colloquy with the defendant that the Court characterized as "facetious." *Id.* at 739-40. Of the convictions cited by the judge, one had been dismissed and Townsend had been acquitted on two others and the Court wrote, "We are not at liberty to assume that items given such emphasis by the sentencing court, did not influence the sentence . . . ." *Id.* at 740. The Court found that on the record before it, Townsend, "while disadvantaged by lack of counsel," was sentenced based on factual assumptions that "were materially untrue." *Id.* at 740-41. It was careful to note that "it [was] the carelessness or designed pronouncement of sentence on a foundation so extensively and materially false, which the prisoner had not opportunity to correct by the services which counsel would provide, that renders the proceedings lacking in due process." *Id.* at 741.

When a defendant requests re-sentencing because he believes the sentencing court relied on inaccurate information, he must show both that the information was in fact inaccurate and that the court relied on that information. *Lechner v. Frank*, 341 F.3d 635, 639 (7th Cir. 2003) (internal citations omitted). "A sentencing court demonstrates actual reliance on misinformation when the court gives

'explicit attention' to it, 'found[s]' its sentence 'at least in part' on it, or gives 'specific consideration' to the information before imposing sentence." *Id.* (citing *United States v. Tucker*, 404 U.S. 443, 447 (1972); *Townsend*, 334 U.S. 736, 741).

In this case, though the judge expressed skepticism over Shirley's version of how the gunshot to the back of the victim's head occurred, he did not state that he believed Shirley stood over Perry and shot him in the head execution style. Though the expert opinion Shirley sought for purposes of his postconviction motion lends support to Shirley's version of events, it does not mean that Shirley's testimony was the only account to be believed. Because the judge, like the jury, was entitled to reject Shirley's version of events, Shirley has not shown that the expert report proves that the judge relied on inaccurate information at sentencing. Accordingly, Shirley has not shown that the court of appeals decision to deny his re-sentencing claim was an unreasonably application of *Townsend* or an unreasonable determination of the facts.

## CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing § 2254 Cases, the court must issue or deny a certificate of appealability "when it enters a final order adverse to the applicant." A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, and n.4).

When the case is resolved on procedural grounds, a certificate of appealability "should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* Section 2253 mandates that both showings be made before a certificate of appealability is granted. *Id.* at 485. Each component of the § 2253(c) showing is part of a threshold inquiry; thus, the court need only address one component if that particular showing will resolve the issue. *Id.*

Jurists of reason would not find it debatable that my findings as to Shirley's argument that the shackling impeded his ability to defend himself and as to Shirley's re-sentencing claim are correct. Thus, Shirley will not be granted a certificate of appealability as to those two claims. However, as to Shirley's *Deck* claim, I will grant him a certificate of appealability. Given the specific facts of this case, namely the fact that although Shirley's shackles were not visible while he testified, Juror 34 previously saw the shackles, I find that jurists of reason would find it debatable whether the petition states a valid constitutional claim. Further, given the fact that Shirley failed to object to Juror 34, but later generally objected under the Fifth Amendment to the shackling, jurists of reason would find it debatable whether my ruling on the procedural default issue is correct. Thus, Shirley will be granted a certificate of appealability as to his *Deck* claim.

### ORDER

**NOW, THEREFORE, IT IS ORDERED** that the petitioner's petition for a writ of habeas corpus (Docket # 1) be and hereby is **DENIED**.

**IT IS FURTHER ORDERED** that the petitioner's motion to decide writ of habeas corpus (Docket # 20) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**.

**IT IS ALSO ORDERED** that a certificate of appealability shall issue as to Shirley's argument under *Deck v. Missouri*, 544 U.S. 622 (2005).

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment accordingly.


Dated at Milwaukee, Wisconsin this 1st day of March, 2018.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge
